**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HAROLD J. DAGGETT,** *Individually and in his capacity as President of the International Longshoremen's Association, AFL-CIO*; **DENNIS DAGGETT,** *Individually and in his capacity as President of Local 1804-1, International Longshoremen's Association, AFL-CIO*; **WM. BERNARD DUDLEY,** *Individually and in his capacity as President of Local 1233, International Longshoremen's Association, AFL-CIO*; **RICHARD SUAREZ,** *Individually and in his capacity as President of Local 1235, International Longshoremen's Association, AFL-CIO*; **DAVID CICALESE,** *Individually and in his capacity as President of Local 1, International Longshoremen's Association, AFL-CIO*; **and JAMES McNAMARA,** *Individually and as the Public Relations Director of the International Longshoremen's Association, AFL-CIO*, <br><br> Plaintiffs, <br><br> v. <br><br> **WATERFRONT COMMISSION OF NEW YORK HARBOR,** <br><br> Defendant. | **No. 16-cv-4314 (ES)** <br><br> **OPINION** |

**SALAS, DISTRICT JUDGE**

On the morning of January 29, 2016, certain workers at marine terminals on the New Jersey side of the Port of New York and New Jersey stopped working. These individuals are represented by a union called the International Longshoremen's Association, AFL-CIO (the "ILA"). On behalf of its constituent locals, the ILA negotiates and administers a collective bargaining agreement with the New York Shipping Association (the "NYSA")—an entity that

represents employers in the Port.  As determined by an emergency arbitration in the afternoon of January 29 itself, the work stoppage violated a no-strike provision of the NYSA-ILA collective bargaining agreement (the "CBA").

Almost immediately after the work stoppage, Defendant Waterfront Commission of New York Harbor (the "Commission") started serving subpoenas on ILA members for testimony relating to its investigation into the work stoppage.  As the Third Circuit recently explained, New Jersey and New York long ago entered into a Compact that created the Commission "to, among other things, eliminate corrupt hiring practices" on the New York/New Jersey waterfront.  *N.Y. Shipping Ass'n Inc. v. Waterfront Comm'n of N.Y. Harbor*, 835 F.3d 344, 348 (3d Cir. 2016).

After months of issuing these subpoenas to rank-and-file ILA members, the Commission issued subpoenas to Plaintiffs.  Plaintiffs subsequently filed this action to quash the subpoenas because, as discussed below, the subpoenas purportedly lack statutory authority and violate the New Jersey Constitution.  Defendant moves to dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6).  (D.E. No. 11).

Having considered the submissions made in support of and in opposition to Defendant's motion, the Court decides this matter without oral argument.  *See* Fed. R. Civ. P. 78(b).  For the reasons in this Opinion, the Court GRANTS the Commission's motion and dismisses the Complaint *without prejudice*.

# I.    Factual Background[1]

## A.  The Parties

The ILA represents longshore workers in ports in certain geographic regions, "including longshore and related craft workers employed by waterfront employers in the Port of New York and New Jersey" (the "Port").  (D.E. No. 1-1 ("Compl.") ¶ 3).  On behalf of its "constituent locals," the ILA "negotiates and administers a collective bargaining agreement with a not-for-profit corporation that represent[s] employers in the Port: the New York Shipping Association, Inc."  (*Id.*).

Plaintiff Harold J. Daggett is president of the ILA.  (*Id.* ¶ 3).  Plaintiff David Cicalese is president of Local 1, ILA, AFL-CIO ("Local l"), which "represents . . . clerks and checkers who are employed by waterfront employers throughout the Port."  (*Id.* ¶ 4).  Plaintiff WM. Bernard Dudley is president of Local 1233, ILA, AFL-CIO ("Local 1233"), which "represents . . . longshoremen who are employed in the Port by NYSA's members in Newark and Elizabeth and who are responsible for loading and unloading cargo on and off ships."  (*Id.* ¶ 5).  Plaintiff Richard Suarez is president of Local 1235, ILA, AFL-CIO ("Local 1235"), which "represents . . . longshoremen who are employed in the Port by NYSA's members in Newark and Elizabeth, and who are responsible for loading and unloading cargo on and off ships."  (*Id.* ¶ 6).  Plaintiff Dennis Daggett is president of Local 1804-1, ILA, AFL-CIO ("Local 1804-1"), which "represents . . . longshore workers known as maintenance and repair ('M&R') workers who are employed by NYSA's members on the New Jersey side of the Port and are responsible for the

---

[1]    The Court must accept Plaintiffs' factual allegations as true for purposes of resolving the pending motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bistrian v. Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012).  Additional factual allegations are provided elsewhere in this Opinion as relevant to the Court's analysis.

maintenance and repair of cargo-handling equipment."  (*Id.* ¶ 7).  Finally, Plaintiff James McNamara has the title of "Director of Public Relations" for the ILA.  (*Id.* ¶ 8).

Collectively, these are the "Plaintiffs."  And Local l, Local 1233, Local 1235 and Local 1804-1 are all parties to the CBA with the NYSA.  (*Id.* ¶¶ 4-7).

Defendant Commission is "a body corporate and politic" that is "an instrumentality of the States of New York and New Jersey."  (*Id.* ¶ 9); N.J.S.A. § 32:23-7.  Its role and function is discussed below.

## B.  The Compact

"In 1953, the States of New York and New Jersey each adopted laws that would form the Waterfront Commission Compact" (the "Compact"), which "was later approved and adopted by the United States Congress."  (Compl. ¶ 10); *see also* N.J.S.A. § 32:23-1; *Waterfront Comm'n of N.Y. Harbor v. Elizabeth-Newark Shipping, Inc.*, 164 F.3d 177, 179 (3d Cir. 1988) ("The Compact is an interstate agreement entered into between New York and New Jersey with the consent of Congress.").[2]  The Compact set forth (among other things) that New Jersey and New York "declare that the conditions under which waterfront labor is employed within the Port of New York district are depressing and degrading to such labor, resulting from the lack of any systematic method of hiring, the lack of adequate information as to the availability of employment, [and] corrupt hiring practices."  N.J.S.A. § 32:23-2.[3]

---

[2]  "Although the Compact is a creature of state legislatures, it is federalized by virtue of congressional approval pursuant to the Compact Clause of the Constitution, art. I, § 10, cl. 3."  *Elizabeth-Newark Shipping, Inc.*, 164 F.3d at 180.

[3]  *See also* N.J.S.A. § 32:23-5 ("The States of New Jersey and New York hereby find and declare that the occupations of longshoremen, stevedores, pier superintendents, hiring agents and port watchmen are affected with a public interest requiring their regulation and that such regulation shall be deemed an exercise of the police power of the two States for the protection of the public safety, welfare, prosperity, health, peace and living conditions of the people of the two States.").

"The Compact, which regulates the employment of waterfront labor in the Port of New York district, established the Waterfront Commission of New York Harbor . . . ." *Elizabeth-Newark Shipping, Inc.*, 164 F.3d at 179. Among other powers and duties prescribed by the Compact, the Commission can "make investigations, collect and compile information concerning waterfront practices generally within the port of New York district and upon all matters relating to the accomplishment of the objectives of this [C]ompact." (Compl. ¶ 12); N.J.S.A. § 32:23-10(11). In particular, the Commission has the power "to administer oaths and issue subpoenas to compel the attendance of witnesses and the giving of testimony and the production of other evidence." N.J.S.A. § 32:23-10(8). "Witness" means "any person whose testimony is desired in any investigation, interview or other proceeding conducted by the [C]ommission pursuant to the provisions of this act." *Id.* § 32:23-85(4).

But the Compact "is not designed and shall not be construed to limit in any way any rights granted or derived from any other statute or any rule of law for employees to organize in labor organizations, to bargain collectively and to act in any other way individually, collectively, and through labor organizations or other representatives of their own choosing." *Id.* § 32:23-68. And "nothing contained in this [C]ompact shall be construed to limit in any way the right of employees to strike." *Id.*

### C.  The January 29, 2016 Work Stoppage

"On Friday, January 29, 2016, between 10:00 am and 11:00 am, some of the union-represented individuals who were working at marine terminals on the New Jersey side of the Port stopped working, and in some cases walked off their jobs." (Compl. ¶ 15). "The work stoppage involved some marine terminals but not others; and consequently, at some locations ILA-represented employees continued to work." (*Id.* ¶ 17). Initial news reports "quoted statements

from an ILA representative stating that he did not know what the work stoppage was about," with some reports characterizing "the stoppage as 'unauthorized by the ILA.'" (*Id.* ¶ 19).

In light of the work stoppage, the "NYSA filed a grievance pursuant to the grievance procedure set forth in the CBA between NYSA and the ILA," which "was accelerated to arbitration, and as a result, an emergency arbitration was scheduled for 3:00 pm" on January 29th. (*Id.* ¶ 20). Before an arbitration decision, the Commission "sent representatives to the Port to serve handwritten subpoenas on union members who appeared to be not working," which "demanded that the workers appear at the Commission's offices in Manhattan to testify under oath." (*Id.* ¶ 21). The subpoenas "also contained a stern warning about the penalties authorized for failing to comply with the subpoena's directives." (*Id.* ¶ 22). Further, before the arbitration was scheduled to begin, the "Commission announced to the media that any port workers who had engaged in the work stoppage that day were in violation of the law." (*Id.* ¶ 23).

"At around 4:00 pm," the arbitrator issued a ruling that, in relevant part, "order[ed] the officers of the [ILA] and its constituent locals in the Port of New York and New Jersey to inform their members that the work stoppages are a violation of the no-strike provision of the NYSA-ILA Collective Bargaining Agreement." (*Id.* ¶ 25). The "ILA took steps to comply with the arbitrator's award and inform their members of the arbitrator's decision" and, further, "released statements to the media urging its members to return to work." (*Id.* ¶ 26).

In the weeks after the work stoppage, the Commission "continued to serve subpoenas on various rank-and-file ILA members throughout the Port." (*Id.* ¶ 28; *see also id.* ¶ 29 (concerning statements to media)). In a letter dated February 3, 2016, the Commission's Deputy Director of

Law explained that the basis for the subpoenas was "to determine who ordered the walkout and why." (*Id.* ¶ 31).[4]

### D. This Action

On or about May 13, 2016, the Commission issued subpoenas to Plaintiffs. (*Id.* ¶ 32). In response to one of the Plaintiffs' inquiry regarding the basis for these subpoenas, the Commission's Director of Law and Licensing stated that the "Commission is investigating the January 29, 2016 unauthorized walkout by longshore workers at various terminals in the Port of New York district" and the "interviews will focus on the walkout." (*Id.* ¶ 33). After back and forth between certain Plaintiffs' counsel and the Commission's counsel (*see id.* ¶¶ 33-34), Plaintiffs then filed the instant action in New Jersey state court—which was subsequently removed to this Court. (*See generally* D.E. No. 1).[5]

The objective of this action is "to quash subpoenas that were issued on May 13, 2016." (Compl. ¶ 1). Plaintiffs bring the following three counts, asserting that: (1) the Commission's subpoenas "Lack Statutory Authority Because They Infringe on Employees' Rights to Engage in Concerted Activities" under N.J.S.A. § 32:23-68 and Section 7 of the National Labor Relations Act (the "NLRA"); (2) the Commission's subpoenas "Lack Statutory Authority Because They Infringe on the Right to Strike" under N.J.S.A. § 32:23-68; and (3) "Any Subpoenas Served for Plaintiffs' Private Records Without a Warrant Violate the New Jersey Constitution" under Article 1, Paragraph 7. (*See* Compl. ¶¶ 35-60; D.E. No. 17 ("Pl. Opp. Br.") at 3). They request this Court to issue a judgment that (1) declares "the outstanding subpoenas void and

---

[4]      For contextual purposes only, the Court notes that this was a letter sent to Plaintiff Harold Daggett's counsel from the Commission's counsel. (*See* D.E. No. 11 ("Def. Mov. Br.") at 11-12 & Exh. E thereto).

[5]      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331. *See Carchman v. Nash*, 473 U.S. 716, 719 (1985); *Cuyler v. Adams*, 449 U.S. 433, 440 (1981); *Elizabeth-Newark Shipping, Inc.*, 164 F.3d at 180.

unenforceable" and (2) permanently enjoins "the Commission from issuing further subpoenas relevant to the January 29, 2016 work stoppage." (Compl. at 13).

The Commission has moved to dismiss Plaintiffs' Complaint under Federal Rule of Procedure 12(b)(6).

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Determining whether there is "a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"When reviewing a motion to dismiss, '[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom.'" *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992)). But the court is not required to accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

So, the inquiry is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the

well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus*, 641 F.3d at 563.

Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." (internal quotation marks, textual modifications and citations omitted)).

## III. Discussion

### A. Count I is dismissed because the Commission's subpoenas here are authorized under the Compact and do not improperly infringe on the Union Employees' right to engage in protected concerted activity

Plaintiffs allege that, before arbitration was scheduled to begin on January 29th, the "Commission announced to the media that any port workers who had engaged in the work stoppage that day were in violation of the law." (Compl. ¶ 23). "Specifically, Phoebe Sorial, general counsel for the Defendant Commission said, 'We do know it's an illegal walk-off.'" (*Id.*). And, "[b]y calling the longshore workers' concerted activity 'illegal,' the Defendant was deliberately attempting to paint the job action as criminal so that the Defendant could conduct an investigation into an area outside its statutory authority." (*Id.* ¶ 40). Plaintiffs appear to argue that the "area outside [the Commission's] statutory authority" is that involving concerted

activities protected under N.J.S.A. § 32:23-68 and 29 U.S.C. § 157 (i.e., Section 7 of the NLRA)). (*See* Compl. ¶¶ 35-45; Pl. Opp. Br. at 9-10).[6]

But the Commission argues that this Count should be dismissed. It argues that it is authorized to investigate waterfront practices generally and all matters relating to the accomplishment of the Compact's objectives. (*See* D.E. No. 22 ("Def. Reply Br.") at 7-12). Further, the Commission argues that the subpoenas do not infringe any right to engage in concerted activities because the work stoppage was not a protected concerted activity under the NLRA. (*See id.* at 12-14).

### 1. The NLRA

As an initial matter, the "term 'concerted activit[y]' is not defined in the [NLRA] but it clearly enough embraces the activities of employees who have joined together in order to achieve common goals." *N.L.R.B. v. City of Disposal Sys.*, 465 U.S. 822, 830 (1984) (first alteration in original). In particular, "Section 7 guarantees employees the right 'to engage in other concerted activities for the purposes of collective bargaining or other mutual aid or protection.'" *Food Fair Stores, Inc. v. N.L.R.B.*, 491 F.2d 388, 393 (3d Cir. 1974). "In defining the scope of concerted activities to be afforded the protection of the Act, courts have generally excluded two types of

---

[6]     Article XV(1) of the Compact provides that:

> This compact is not designed and shall not be construed to limit in any way any rights granted or derived from any other statute or any rule of law for employees to organize in labor organizations, to bargain collectively and to act in any other way individually, collectively, and through labor organizations or other representatives of their own choosing. Without limiting the generality of the foregoing, nothing contained in this compact shall be construed to limit in any way the right of employees to strike.

N.J.S.A. § 32:23-68.

      Section 7 of the NLRA provides, in relevant, part that: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

employee conduct, both involved here—unauthorized strikes and strikes in breach of a collective bargaining agreement." *Id.*[7]

Here, Plaintiffs allege a work stoppage that the ILA disavowed and, by their own allegations, constituted a strike. (*See* Compl. ¶¶ 15-19, 46-53). And Plaintiffs also allege that an arbitrator determined the stoppage violated a no-strike provision of the CBA—which covers the work in question—and that the ILA "took steps to comply with the arbitrator's award and inform their members of the arbitrator's decision." (*Id.* ¶¶ 16, 25-26). In fact, Plaintiffs concede, as they must, that "there is no dispute that the January 29, 2016 work stoppage was '"unauthorized."'" (Pl. Opp. Br. at 12).

So, even accepting that concerted activity is at issue here and accepting all the allegations as true, it is unclear how the Commission's subpoenas lack statutory authority under the NLRA because such activity appears *unprotected* in that it violates the CBA's no-strike provision. *See Food Fair Stores*, 491 F.2d at 393-95 ("[T]he law is clear that strikes carried out in violation of a no-strike provision in a collective bargaining agreement are not protected by the [NLRA] . . . .").[8] The Court finds Plaintiffs' arguments to the contrary do not apply to this case and are without merit. (*See* Pl. Opp. Br. 10-14 (discussing strikes to improve work conditions, employees joining together for a common benefit, and policy concerns about "the chilling effect that will result from the Commission's blatant abuse of authority here")). Thus, the Court finds

---

[7]     *See also City of Disposal Sys.*, 465 U.S. at 837 ("[I]f an employer does not wish to tolerate certain methods by which employees invoke their collectively bargained rights, he is free to negotiate a provision in his collective-bargaining agreement that limits the availability of such methods. No-strike provisions, for instance, are a common mechanism by which employers and employees agree that the latter will not invoke their rights by refusing to work. In general, if an employee violates such a provision, his activity is unprotected even though it may be concerted.").

[8]     *See also N.L.R.B. v. Washington Aluminum Co.*, 370 U.S. 9, 17 (1962) ("It is of course true that [§] 7 does not protect all concerted activities . . . . The activities engaged in here do not fall within the normal categories of *unprotected concerted activities* such as those that are unlawful, violent or in *breach of contract*.") (emphasis added) (footnotes omitted); *Mt. Clemens v. General Hosp. v. N.L.R.B.*, 328 F.3d 837, 845 (6th Cir. 2003) ("Employees can lose Section 7 protections if they engage in concerted activity that violates a contractual no-strike provision.") (citing *City Disposal Systems*, 465 U.S. at 837).

that Plaintiffs have failed to state a claim under Rule 12(b)(6) in Count I to the extent they rely on Section 7 of the NLRA.

### 2. Article XV(1) of the Compact (N.J.S.A. § 32:23-68)

Plaintiffs also allege—under Count I—that the subpoenas contravene N.J.S.A. § 32:23-68. (*E.g.*, Compl. ¶¶ 37, 45). In short, Plaintiffs argue that the Commission's "investigative authority . . . must yield to the rights of the ILA and its members to engage in protective concerted activities as set forth in Article XV(1) of the Compact" and, therefore, the Commission is acting outside the scope of its authority. (Pl. Opp. Br. at 9-10, 14 (citing N.J.S.A. § 32:23-68)). The Court is not so persuaded.

"In addition to the powers and duties elsewhere prescribed in this [C]ompact, the [C]ommission shall have the power . . . [t]o make investigations, collect and compile information *concerning waterfront practices generally* within the port of New York district and upon all matters *relating to* the accomplishment of the objectives of this compact." N.J.S.A. § 32:23-10(11) (emphasis added). Both parties appear to cite N.J.S.A. § 32:23-2 as relating to the objectives of the Compact. (*See* Pl. Opp. Br. at 8-9; Def. Reply Br. at 9). That provisions states as follows:

> The States of New Jersey and New York hereby find and declare that the conditions under which waterfront labor is employed within the Port of New York district are depressing and degrading to such labor, resulting from the lack of any systematic method of hiring, the lack of adequate information as to the availability of employment, corrupt hiring practices and the fact that persons conducting such hiring are frequently criminals and persons notoriously lacking in moral character and integrity and neither responsive or responsible to the employers nor to the uncoerced will of the majority of the members of the labor organizations of the employees; that as a result waterfront laborers suffer from irregularity of employment, fear and insecurity, inadequate earnings, an unduly high accident rate, subjection to borrowing at usurious rates of interest, exploitation and extortion as the price of

securing employment and a loss of respect for the law; that not only does there result a destruction of the dignity of an important segment of American labor, but a direct encouragement of crime which imposes a levy of greatly increased costs on food, fuel and other necessaries handled in and through the Port of New York district.

N.J.S.A. § 32:23-2.

Importantly, the Compact was enacted "in order to eliminate evil conditions on the waterfront in the Port of New York Harbor"—and the "principal evil sought to be eliminated was the domination by criminal elements of the International Longshoremen's Association, which represents waterfront labor." *In re Application of Waterfront Comm'n*, 32 N.J. 323, 331 (N.J. 1960). "In order to further the elimination of waterfront evils, the Commission is empowered to investigate waterfront practices and other matters bearing on the objectives of the Compact, and to make recommendations to the two states for improvement of waterfront conditions and for effectuation of the purposes of the Compact." *Id.* at 332. Indeed, the "Commission's investigative function within its statutory jurisdiction is very like that of a grand jury. It must not act arbitrarily, or in excess of its jurisdiction, *but the scope of its investigations is not to be limited by conjectural forecasts of their probable result*." *Id.* at 335 (emphasis added).

In effect Plaintiffs appear to aver that the Commission's investigation cannot implicate anything in N.J.S.A. § 32:23-2 and, therefore, there is no statutory authority for the issued subpoenas. In particular, Plaintiffs argue that they alleged facts "plausibly establishing . . . that the Commission had no reason to believe that the work stoppage was designed to inhibit the Act." (Pl. Opp. Br. at 19-20). But Plaintiffs tellingly concede that the purpose of the work stoppage "is still unclear." (*Id.* at 19).

Drawing on judicial common sense that this Court may employ in a Rule 12(b)(6) inquiry, the problem with Plaintiffs' contention is as follows. Plaintiff's position effectively

requires the Commission to: (1) disclose right now the nature of its investigation (e.g., whether the work stoppage was to protest the Commission's insistence on certain hiring practices); (2) disclose this while its investigation is ongoing; and (3) make such disclosures without allegations from which the Court can conclude that the Commission's investigation is so plainly futile so as to make it impossible to uncover anything legitimate. *See In re Application of Waterfront Comm'n*, 32 N.J. at 335 ("Only where the agency acts arbitrarily, or, in the words of Mr. Justice Cardozo, (256 N.Y. 220, 176 N.E. 539.) 'where the futility of the process to uncover anything legitimate is inevitable or obvious' may the process be vacated.").[9] After all, "[i]f the issue to be tried is whether the Commission actually has the information it claims to have, then the whole preliminary investigative process would be subject to scrutiny in advance of any investigation." *Id.* at 334.

The Court also notes that Plaintiffs allege: (1) initial news reports "quoted" an unidentified "ILA representative stating that he did not know what the work stoppage was about" (Compl. ¶ 19); (2) certain news reports "characterized the stoppage as 'unauthorized by the ILA'" (*id.*); (3) the ILA "took steps to comply with the arbitrator's award and inform their members of the arbitrator's decision" (*id.* ¶ 26); and (4) the ILA "also released statements to the media urging its members to return to work (*id.*). Looking at the totality of the allegations and employing judicial common sense, the Court cannot help but notice that none of the named Plaintiffs in this action are alleged to have made such statements or representations such that the Commission's investigation is arguably, on its face, futile.

---

[9]       This may very well beg the question: under what circumstance is the Commission's action arbitrary or the futility obvious?  The Court need not answer that question here because the operative Complaint *in this case* does not permit the Court to draw any such conclusion at this time.  The Court need not opine on hypothetical scenarios where—on their face—the Commission is acting arbitrarily or where there is manifest futility of the process to uncover anything legitimate.

Finally, Plaintiffs fail to provide this Court with any analogous case law—i.e., case law limiting the Commission's authority to issue subpoenas in analogous circumstances. Without some authority to that effect—or a persuasive explanation why the aforementioned analysis is misdirected—the Court declines Plaintiffs' invitation at this time to so limit the Commission's subpoena authority under N.J.S.A. § 32:23-10 or, indirectly, the objective of the Compact. *Cf. In re Application of the Waterfront Comm'n of N.Y. Harbor*, 35 N.J. 62, 75 (1961) ("We hold that the Commission may investigate a waterfront work stoppage when the Commissioners have reason to believe that the stoppage is designed to inhibit effective operation of the act. The Commission is entitled to know all of the facts surrounding such a stoppage so that it may intelligently determine whether persons registered or licensed by the Commission have violated any provision of the act and so that it may fulfill its statutory duty of recommending to the state governments measures for the improvement of the conditions on the New York-New Jersey waterfront."); *In re Application of Waterfront Comm'n*, 32 N.J. at 336 ("No doubt the interests of men to be free from officious intermeddling call for protection. But we feel that these interests may be adequately protected without a full judicial trial at the threshold of an investigation into the question whether it will uncover matter which should in the public interest be uncovered.").

As such, Plaintiffs' claim (Count I)—that the Commission's subpoenas lack statutory authority based on Section 7 of the NLRA and/or N.J.S.A. § 32:23-68—is hereby dismissed *without prejudice* under Federal Rule of Civil Procedure 12(b)(6).

### B. Count II is dismissed because the Court finds that the allegations are insufficient to support a claim for infringement on the Employees' right to strike

In Count II, Plaintiffs again cite N.J.S.A. § 32:23-68, alleging that "the Compact specifically says that it shall not be construed to limit the employees' right to strike: 'nothing

contained in this compact shall be construed to limit in any way the right of employees to strike.'
N.J.S.A. 32-23-68." (Compl. ¶ 48). In particular, Plaintiffs allege that the "Commission's use of
subpoenas demanding depositions of union officers about striking workers has the intent and the
effect of chilling future strikes." (*Id.* ¶ 51).

The Commission argues, however, that "[i]t is well-settled that the statutory right to
strike may be waived in a collective bargaining agreement." (Def. Reply Br. at 15 (citations
omitted)). It contends that, "as found by the arbitrator, the work stoppage was in violation of the
no-strike provision in the NYSA-ILA CBA, and therefore, the ILA had no right to engage in the
stoppage." (*Id.*). The Commission argues that, therefore, its investigation is not improperly
interfering with any protected rights. (*See id.*).

In opposition, Plaintiffs contend that, like the Commission's arguments concerning Count
I, its arguments in favor of dismissal are "premised upon an unsupportable legal proposition,
namely that the CBA's no-strike clause completely extinguishes the right to strike afforded under
Article XV(1) of the Act." (Pl. Opp. Br. at 14). They argue that, "accepting the allegations of
the Complaint as true, it is clear Plaintiffs have stated a valid claim that the Commission is in
violation of Article XV of the Act." (*Id.* at 15-17 (citing allegations)).

Article XV(1) provides that

> This compact is not designed and shall not be construed to limit in
> any way any rights granted or derived from any other statute or any
> rule of law for employees to organize in labor organizations, to
> bargain collectively and to act in any other way individually,
> collectively, and through labor organizations or other
> representatives of their own choosing. Without limiting the
> generality of the foregoing, nothing contained in this compact shall
> be construed to limit in any way the right of employees to strike.

N.J.S.A. § 32:23-68. But "the language of Article XV is not absolute," and the Third Circuit has
"held that collective bargaining rights cannot supersede 'the Commission's supervisory role

regarding practices that might lead to corruption.'" *N.Y. Shipping Ass'n Inc.*, 835 F.3d at 357 (quoting *Waterfront Comm'n of N.Y. Harbor v. Sea Land Serv., Inc.*, 764 F.2d 961, 966-67 (3d Cir. 1985)).

Plaintiffs' cause of action in Count II is that the subpoenas "Lack Statutory Authority Because They Infringe on the Right to Strike" under N.J.S.A. § 32:23-68. (Compl. ¶¶ 46-53). Distilling the parties' arguments, it appears that the crux of the dispute concerning Count II is the allegation in Paragraph 51 of the Complaint: "The Commission's use of subpoenas demanding depositions of union officers about striking workers has the intent and the effect of chilling future strikes." (*See* Def. Mov. Br. at 22, 24; Pl. Opp. Br. at 17, 21; Def. Reply Br. at 14, 15). Indeed, Plaintiffs argue that "the Commission . . . misses the core of Plaintiffs' allegations that the Commission's investigation had the intent and effect of chilling *future* strikes." (Pl. Opp. Br. at 21 (emphasis in original) (citing Compl. ¶ 51)).

As already noted, the Commission has a statutory basis to investigate "waterfront practices generally within the port of New York district and upon all matters relating to the accomplishment of the objectives" of the Compact and, specifically, can issue subpoenas. N.J.S.A. §§ 32:23-10(8), 10(11). In Plaintiffs' Complaint there are simply no *factual allegations* concerning any intent or effect of chilling future strikes. Although Plaintiffs' opposition discusses allegations that they feel support their claim, their position appears to boil down to one thing: the dispute between the collective bargaining parties—i.e., the ILA and the NYSA—had been resolved. (*See* Pl. Opp. Br. at 15-17). Accordingly, in their view, any further investigation by the Commission has a chilling effect on the ability to strike. (*See id.*). In fact, in connection with Count II, Plaintiffs' opposition is tellingly replete with accusatory conclusions that the Commission has "decided to stir the pot by investigating who was responsible for ordering the

walkout," the Commission "made no attempt to be neutral," and that the Commission has "harass[ed] rank-and-file employees." (*See* Pl. Opp. Br. at 16).[10]

But "[p]ermitting a claim to go forward on nothing more than speculation and hope that some supporting fact might be revealed in discovery would render Rules 8(a)(2) and 12(b)(6) completely meaningless." *Hopkins v. DiCristi*, No. 13-5490, 2015 WL 7760176, at *8 (D.N.J. Dec. 1, 2015). Setting aside the accusatory language in Plaintiffs' opposition, the Court finds that the allegations in the actual Complaint amount—at best—to a "sheer possibility that a defendant has acted unlawfully" and therefore fail to meet the plausibility standard. *See Iqbal*, 556 U.S. at 678. It is simply unclear to this Court how the Commission's investigation contravenes N.J.S.A. § 32:23-68 in view of the allegations in this case. This is particularly so because the Third Circuit has unequivocally stated that "the language of Article XV is not absolute" and "cannot supersede the Commission's supervisory role regarding practices that might lead to corruption." *N.Y. Shipping Ass'n Inc.*, 835 F.3d at 357 (internal quotation marks and citation omitted).

Accordingly, Count II is hereby dismissed *without prejudice*.

### C. Count III is dismissed because Plaintiffs do not identify any subpoena served by the Commission on third parties—or allege why such information is unavailable

In Count III, Plaintiffs allege that, "[u]pon information and belief," the Commission "has been issuing subpoenas to third parties in order to obtain telephone records, mobile phone records, and other personal information about ILA members and officers." (Compl. ¶ 55). Plaintiffs aver that the New Jersey Supreme Court "has held that Article I, Paragraph 7, of the

---

[10] The history and relationship involving the ILA and the Commission is apparently a sordid one. If nothing else, this is apparent from briefing that is laden with conjecture, hyperbole, and accusatory statements. But some of the finest lawyers that have advocated their positions before this Court have done so without the use of such rhetoric. This Court places a premium on civility, professionalism, and perhaps most of all, writing that is concise and clear. Notwithstanding the parties' differences, the Court expects the parties' lawyers to bear this in mind for any future motion practice or, if necessary, oral argument.

New Jersey Constitution protects an individual's privacy interest in bank records, telephone records, mobile phone records, and Internet records" and that a warrant is required before such personal information can "be searched or seized."  (*Id.* ¶¶ 57-58).  To be sure, the title of Count III shows that this claim concerns "Plaintiffs' Private Records."  (*Id.* at 12).

"Article I, Paragraph 7 of the New Jersey Constitution guarantee[s] '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' and set[s] forth the requirements for warrants."  *State v. Robinson*, 2017 WL 1548798, at *8 (N.J. May 1, 2017) (certain alterations in original).

In moving to dismiss, the Commission asserts that "Plaintiffs provide no explanation whatsoever as to (1) the identity of the 'third parties' upon whom the subpoenas were allegedly served; (2) when the subpoenas were served, (3) a definite description of the records and 'other personal information' that have been requested by the Commission pursuant to these unidentified subpoenas; and (4) the location of the 'third parties.'"  (Def. Mov. Br. at 26-27).  It contends that the "only subpoenas that are specifically identified in the entire Complaint are those that were served on the six named ILA Plaintiffs, which are not at issue in Count III."  (*Id.* at 27).

In opposition, Plaintiffs argue that they "had no choice at this early stage but to base their allegations 'upon information and belief'—a perfectly prudent and understandable approach under the liberal standard on a motion to dismiss and the present circumstances."  (Pl. Opp. Br. at 22 (citation omitted)).  They posit that "Rule 8 does not require the Plaintiffs to specify at this early stage exactly which bank or which mobile phone provider the records were obtained from." (*Id.* at 23).  And Plaintiffs aver that the Commission's very argument in support of dismissal "further supports Plaintiffs' claim that the Commission is secretly issuing subpoenas to third parties illegally obtaining Plaintiffs' private records."  (*Id.* at 24 (citing Compl. ¶¶ 54-60)).

As noted, the "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Notably, whether there is "a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Here, Plaintiffs argue that "the Commission has no one but its own secrecy to blame for the gaps in Plaintiffs' knowledge." (Pl. Opp. Br. at 23). Plaintiffs also state that the "identity of the third parties is unknown due to the Commission's non-disclosure and confidentiality requirements imposed on deponents by the stern language of the Commission's subpoenas." (*Id.* (citing Compl. ¶¶ 22, 58-60)). But nothing in Paragraphs 22, 58, 59 or 60 allege anything about "non-disclosure" or "confidentiality requirements." And the Court cannot permit Plaintiffs to amend their Complaint by way of an opposition brief to a motion to dismiss. *See Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988).

Further, Plaintiffs do not offer anything—whether in their Complaint or in their opposition brief—concerning *when* the subpoenas were served or the *location* of the third parties. In their opposition, Plaintiffs address this only by arguing that "the Commission is secretly issuing subpoenas to third parties illegally obtaining Plaintiffs' private records." (Pl. Opp. Br. at 24 (citing Compl. ¶¶ 54-60)). Once again, however, nothing in Paragraphs 54 through 60 of Plaintiffs' Complaint references the alleged *secret* issuance of subpoenas.

In sum, Plaintiffs cannot amend their Complaint by way of an opposition brief, and the Court finds Plaintiffs have failed to plead enough facts to suggest more than mere speculation. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").[11]

---

[11]     In resolving the Commission's motion to dismiss, the Court declines to consider various arguments made in favor of and in opposition to the motion. (*See, e.g.*, Pl. Opp. Br. at 7 ("When considering Defendant's motion to

## IV.   Conclusion

For the reasons above, the Court dismisses Plaintiffs' Complaint *without prejudice*.  An

appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

---

dismiss, this Court should ignore extrinsic documents cited by the Commission."); Def. Reply Br. at 3-7 (requesting the Court to consider certain documents)).  As such, the Court need not resolve such disputes because they are unnecessary to the Court's determination at this time.